## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

**DANIELLE RUTLEDGE,**

**Case No.: 1:24-cv-4188**

**Plaintiff,**

-against-

**SCHWARTZ SLADKUS REICH GREENBERG ATLAS LLP,**
**ANDREA TROCHEZ,**
**SAPPHIRE CENTER FOR REHABILITATION AND NURSING OF CENTRAL QUEENS, LLC f/k/a FLUSHING NURSING AND REHABILITATION CENTER, FMNH, LLC d/b/a FLUSHING MANOR NURSING HOME a/k/a SAPPHIRE CENTER FOR REHABILITATION AND NURSING OF CENTRAL QUEENS, LLC,**

**Defendants.**

-------------------------------------------------------------------X

### ORIGINAL COMPLAINT

Plaintiff Danielle Rutledge brings suit against Defendant Schwartz Sladkus Reich Greenberg Atlas LLP ("Schwartz"), a debt collection law firm, and Schwartz attorney Andrea Trochez (collectively "Attorney Defendants") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. and N.Y. Jud. Law § 487; and against Attorney Defendants and Defendants Sapphire Center for Rehabilitation and Nursing of Central Queens, LLC f/k/a Flushing Nursing and Rehabilitation Center and FMNH, LLC d/b/a Flushing Manor Nursing Home d/b/a Sapphire Center for Rehabilitation and Nursing of Central Queens, LLC, a nursing home, (collectively "the Nursing Home"), for violations of N.Y. Gen. Bus. Law § 349 *et seq*, negligence and gross negligence, and in support would show as follows.

### Summary of Claims[1]

_____

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis

On April 3, 2020, the New York legislature enacted CPLR § 213-D, which requires that collection actions for medical debts be brought "within three years of treatment." In other words, any debt arising from treatment at a facility like a nursing home that happened more than three years ago is time-barred. New York courts have applied this shortened statute of limitations to claims that began to accrue prior to April 3, 2020 after applying a 1 year "grace period" and, where applicable, 228 days of COVID-19 tolling provided a reasonable time for health care providers to take note of the new limitations period and proceed accordingly.

Years after this new statute of limitations took effect, Defendants continue to file collection lawsuits more than 3 years after the medical treatment in question. In the case of Danielle Rutledge, Defendants should have been especially wary as they had voluntarily discontinued the first collection lawsuit against her and were filing a second collection lawsuit on the same debt nearly 2 years later.

Further, the amount sought by the collection lawsuit is nonsensical in light of documents provided to Danielle Rutledge by the Nursing Home. The Nursing Home appears to not be correctly calculating the amount of the debt incurred by the services provided to Danielle's mother Edna Rutledge. In short, Danielle Rutledge is unfortunately one of many consumers sued by Attorney Defendants over time-barred debts arising from nursing home care. Attorney Defendants' persistent filing of collection lawsuits after expiration of the 3 year statute of limitations, effective since April 3, 2020, evinces a reckless disregard or willful contempt for the due process rights of consumers.

The Defendants' conduct has compounded the emotional distress suffered by Danielle

---

of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

Rutledge, who is already going through the incredibly difficult ordeal of seeing her mother Edna Rutledge in the final moments of her life after having a stroke. Fighting a collection lawsuit in the midst of this already difficult period is overwhelming.  The stress resulting from the collection lawsuit has caused her to be able to only get a few hours of sleep each night. She gets so overwhelmed because of the collection lawsuit that she cries multiple times each week. She worries how she will pay her bills if the collection lawyers obtain a judgment against her for the principal amount of $24,632 – more than half of what she makes in an entire year – and begin to garnish her wages or restrain her bank account. And she has incurred contractual liability for attorney's fees and costs in defending the unlawful collection lawsuit.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Queens County, New York.

## B.   PARTIES

3.      Plaintiff Danielle Rutledge is an individual residing in Queens County, New York.

4.      Defendant Schwartz Sladkus Reich Greenberg Atlas LLP ("Schwartz") is a law firm and

professional limited liability corporation organized under the laws of the State of New York. Said Defendant engages in business in New York. This suit arose out of said Defendant's business in New York.

5.      Schwartz regularly collects consumer debts owed or due to others, specifically for nursing homes, by filing hundreds of collection lawsuits. Schwartz is therefore a debt collector as defined in 15 U.S.C. § 1692a(6).

6.      In 2023 alone, Schwartz filed at least 160 collection lawsuits on behalf of different nursing homes in New York civil courts and at least 58 collection lawsuits on behalf of different nursing homes in New York supreme courts.

7.      Defendant Andrea Trochez is an attorney at Schwartz who practices in New York courts and, upon information and belief, resides in New York.

8.      Trochez has filed hundreds of collection lawsuits on behalf of different nursing homes in New York civil and supreme courts, including the 2021 and 2023 collection lawsuits, as well as litigating those cases, by propounding discovery requests, and by obtaining or seeking to obtain settlements or judgments in those cases.

9.      Consequently, Trochez regularly collects consumer debts owed or due to others, specifically for nursing homes, and is therefore a debt collector as defined in 15 U.S.C. § 1692a(6).

10.     Trochez engages in such debt collection within the scope of her employment by Schwartz. Trochez and Schwartz shall be collectively referred to as "Attorney Defendants."

11.     Defendant Sapphire Center for Rehabilitation and Nursing of Central Queens, LLC ("Sapphire") is a limited liability company organized on or around August 7, 2013 under the laws of the state of New York that provides residential nursing home care and services at premises located at

Last saved: 6/12/2024 1:30 PM

35-15 Parsons Blvd., Flushing, NY 11354. **Exhibit A** (Sapphire NYSOS Entity Information).

12.      Sapphire lists, as its registered agent, Richard Platschek, an infamous owner of several nursing homes throughout the state of New York according to an ABC 7 article titled "Don't ever put your loved one in here, ever" about Sapphire. **Exhibit B** (Nursing Home Article).

13.      Sapphire's current legal name was adopted on December 12, 2014, changing from the original name "Kennedy Pavilion RH III, LLC." **Exhibit A.**

14.      And on October 14, 2020, Sapphire listed with the New York Secretary of State "Flushing Nursing and Rehabilitation Center" as an assumed name, though this was discontinued on June 28, 2022. *Id.*

15.      However, Sapphire is just the most recently formed corporation running the Nursing Home, and it is unclear from the publicly available information whether the former corporation, which is still listed as active, runs the Nursing Home concurrently, is inactive, or has taken on a new function.

16.      FMNH, LLC is a limited liability company organized on or around May 16, 2008 under the laws of the state of New York that provided, and upon information and belief continues to provide, residential nursing home care and services at premises located at 35-15 Parsons Blvd., Flushing, NY 11354. **Exhibit C** (FMNH NYSOS Entity Information).

17.      On or around May 19, 2008, FMNH took on the name "Flushing Manor Nursing Home." *Id.*

18.      Plaintiff believes that FMNH, LLC is involved with some or all the nursing home operations at 35-15 Parsons Blvd., Flushing, NY 11354 because of its appearance in cases where the nursing home is being sued, even when FMNH itself is not named. For example, in *Mei-Ling Chung v. Jackson Heights Care Center, LLC d/b/a Regal Heights Rehabilitation and Care Center; and Flushing Manor Care Center, Inc. a/k/a Flushing Manor Nursing Home, Inc. a/k/a Flushing Geriatric*

*Center, Inc. d/b/a The Pavilion at Queens for Nursing and Rehabilitation a/k/a Flushing Manor Nursing and Rehabilitation d/b/a Sapphire Center for Rehabilitation and Nursing of Central Queens, LLC,* Index No. 71074/2015, FMNH, LLC filed an answer on behalf of the second defendant with six different names (including the name of Defendant Sapphire) despite "FMNH, LLC" not being named as a defendant. **Exhibit D** (*Chung* Answer).

19.     Upon information and belief, FMNH and Sapphire operate collectively as a common or joint enterprise for the purpose of running the subject nursing home at 35-15 Parsons Blvd. As such, they will be collectively referred to as "the Nursing Home."

20.     The Nursing Home (as well as other nursing homes owned by Richard Platschek) uses Attorney Defendants to file the collection lawsuits against third parties for nursing home debts arising from their unlawful standard Admission Agreement.

21.     Attorney Defendants are the freely chosen counsel of the Nursing Home. Attorney Defendants were the agents of the Nursing Home acting in the course and scope of that agency. For these reasons and others, the Nursing Home is jointly and severally liable for the acts of the Attorney Defendants on behalf of the Nursing Home. Therefore, when acts are taken by the Attorney Defendants on behalf of the Nursing Home this Complaint will at times simply identify those acts of Defendants, jointly and severally.

### C.  STATEMENT OF FACTS

22.     In 2018, Edna Rutledge suffered a stroke.

23.     At first, her daughter Danielle Rutledge and the rest of the family were hopeful for recovery, as Edna was speaking after the stroke.

24.     Unfortunately, in a few days, Edna lost the ability to speak, as well as the ability to swallow by herself, and thus it was determined that longer term rehabilitation would be necessary.

Last saved: 6/12/2024 1:30 PM

25.     Even then, the family still expected Edna to eventually come home and that any stay in a nursing home would be short term.

26.     On April 16, 2018, Edna Rutledge was moved from the stroke ward of the hospital to the Nursing Home.

27.     On April 18, 2018, the Nursing Home told Danielle Rutledge that she had to sign the Nursing Home's standard Admission Agreement in order for Edna Rutledge to be admitted to the Nursing Home. **Exhibit E** (Admission Agreement).

28.     Danielle told the Nursing Home that she did not want to be personally liable for the costs of her mother's care. The Nursing Home simply insisted that Danielle had to sign the Agreement for her mother to stay.

29.     Danielle Rutledge signed the Admission Agreement, believing that she would not be personally liable for any debt incurred from the Nursing Home providing services to her mother Edna Rutledge.

***Debt Accrues Until the Social Security Checks Begin to Be Sent to the Nursing Home Directly***

30.     As aforementioned, when Edna Rutledge was originally admitted to the Nursing Home, her family believed it would be short term and that she would eventually return to her home.

31.     On July 26, 2018, Edna Rutledge was approved for "Chronic Care" at the Nursing Home through Medicaid. **Exhibit F** (Medicaid Notice of Acceptance).

32.     Notably, this was received soon after admission, probably due to the continual persistent efforts of Danielle Rutledge, who asked the Nursing Home repeatedly about the process for getting her mother on Medicaid and the status of the application.

33.     The Notice provided that the Medicaid was effective as-of the month of admission, April

Last saved: 6/12/2024 1:30 PM

2018. *Id.*

34.     Further, the Notice provided the NAMI rates for each month. *Id.*

35.     The NAMI was set to increase on October 1, 2018 from $782 a month to $1,594 a month when Medicare D coverage was set to end. *Id.*

36.     However, the NAMI would continue to be offset by Medicare B (in the amount of $509 per month) as well as a monthly Personal Needs Allowance (PNA) of $50 a month. *Id.*

37.     Notably, this Notice was not sent to Danielle, but to the Nursing Home. *Id.*

38.     Upon information and belief, the Nursing Home did not take any steps to inform Danielle of the Notice of Acceptance, or even of the amount of the NAMI that was owed, despite the provisions of the Admission Agreement claiming to make her responsible for them.

39.     As such, believing that Medicare and Medicaid were covering the stay, Edna's family continued to use her Social Security check to pay for Edna's rent at their home until she returned.

40.     Accordingly Edna Rutledge, unbeknownst to Danielle, began to incur a debt to the Nursing Home for the missed NAMI payments.

41.     This debt continued to accrue until November of 2019.

42.     On or around this time, it had become clear that Edna Rutledge was unfortunately not going to be coming home and required long-term care for the remainder of her life.

43.     As such, Danielle arranged for Edna Rutledge's Social Security checks to be sent directly to the Nursing Home.

44.     Once the Nursing Home began to receive the Social Security checks directly, it began to apply them to pay each month's NAMI, and putting any remaining funds in an account held by the Nursing Home. The Nursing Home informed Danielle Rutledge that any personal expenses for her mother, such as purchasing her clothes, could be reimbursed from the funds in this account.

45.     On or around June 10, 2020, the Nursing Home claims to have sent Danielle (misspelled "Daniele") an invoice listing the total NAMI debt, accrued from May 2018 to October 2019, of $24,632. **Exhibit G** (2020 Invoice).

46.     Danielle does not recall receiving this invoice, but if she had, she would likely have dismissed it as an error since she still believed that she was not personally liable and further knew her mother was now receiving Medicaid in addition to Medicare.

47.     Moreover, Danielle's attention was on the condition of the Nursing Home, which like many nursing homes in the state had many residents dying of COVID-19.

48.     Danielle would even be contacted by the New York Attorney General regarding an investigation into the Nursing Home concerning its quality of care and whether it was openly communicating with family members about what was happening with COVID-19.

### *The 2021 Lawsuit*

49.     On or around December 16, 2021, the Attorney Defendants, on behalf of the Nursing Home, filed a Summons and Complaint in Queens County Civil Court to initiate a collection lawsuit against Danielle Rutledge, captioned *Sapphire Center for Rehabilitation & Nursing of Central Queens v. Rutledge*, CV-030810-21/QU ("the 2021 Collection Lawsuit"). **Exhibit H** (2021 Summons and Complaint).

50.     The Summons and Complaint were both signed by Defendant Andrea M. Trochez. *Id.*

51.     Further, Trochez also signed an Attorney's Affirmation (*Id.,* p. 9), stating in pertinent part that she had read the complaint, knew the contents thereof, and "To the best of my knowledge, the contents of the complaint are true except those matters alleged on information and belief, as to those matters I believe them to be true."

52.     She also stated that she reviewed "documents and records in possession of plaintiff" and

had "conversations and communications with employees, agents and servants of plaintiff." *Id.*

53.     Thus by signing, filing, and serving the Summons and Complaint, Attorney Defendants represented to the court and to Danielle Rutledge that they had performed a meaningful attorney review prior to filing the 2021 Collection Lawsuit.

54.     The 2021 Collection Lawsuit sought $24,632 with interest from November 30, 2019 and costs. *Id.*

55.     Attached to the 2021 Collection Lawsuit was the 2020 Invoice (*Id.*, p. 11), and the body of the Complaint made it clear that the 2021 Collection Lawsuit was seeking the $24,632 amount for missed NAMI payments from May 2018 to October 2019.

56.     While Danielle Rutledge would receive a copy of the 2021 Collection Lawsuit in the mail, it was never served on her.

57.     Years later, when her attorneys pulled the court file, they discovered that no affidavit of service was ever filed in the case.

58.     It is unclear why the Defendants failed to prosecute the case for the next 536 days.

59.     However, in the interim on or around January 9, 2023, Danielle confusingly received a document titled Resident Funds Ledger. **Exhibit I** (January Resident Funds Ledger).

60.     This document has Sapphire's name and address on the header, and is addressed to Danielle, though again misspelling her name as most of the Nursing Home's communications did. *Id.*

61.     The document shows a time period of October 1, 2022 to January 9, 2023. *Id.*

62.     The first entry in the Ledger shows a credit of $4,355.46. *Id.*

63.     Subsequent entries show either credits when Edna Rutledge's Social Security checks were received by the Nursing Home or debits titled "Nami transfer to SCR." *Id.*

64.     As of the date of the ledger, January 9, 2023, a $4,407.00 credit is shown on the account. *Id.*

65.     This was a bizarre document from the Nursing Home when, about a year before, the Nursing Home had mailed Danielle Rutledge a lawsuit against her alleging a $24,632 debt. *Id.*

66.     However, the credit appears on the face of the document to be calculated inaccurately below what it should have been.

67.     First, it is unclear why Medicare Part B amounts were not being applied to offset the NAMI, as was done in the initial calculation of the NAMI by DSS. *Compare* **Exhibit F** (Medicaid Notice of Acceptance) (showing calculation of NAMI as of October 1, 2018 by reducing Social Security monthly income of $2,153 by PNA of $50 and Medicare Part B of $509).

68.     Even if it is assumed that for whatever reason Medicare Part B stopped coverage by this time, two out of three of the NAMI payments show the Nursing Home applying *the entire Social Security check* to the NAMI, without even deducting the $50 PNA monthly allowance that Medicaid nursing home residents receive.

69.     In short, the January Resident Funds Ledger both seemed to show that there was a credit rather than a debt owed for the nursing services provided to Edna Rutledge, and further that the Nursing Home appeared to be improperly applying the entire Social Security check on some months to the NAMI.

70.     For unknown reasons, on or around June 5, 2023, Attorney Defendants filed and mailed to Danielle Rutledge a Notice of Discontinuance for the 2021 Collection Lawsuit. **Exhibit J** (Discontinuance of 2021 Lawsuit).

71.     The Discontinuance was signed by Andrea Trochez. *Id.*

### *Defendants File the Identical, But Now Time-Barred, 2023 Lawsuit*

72.     On or around June 15, 2023, the Attorney Defendants, on behalf of the Nursing Home, filed a Summons and Complaint in Queens County Civil Court to initiate a collection lawsuit against Danielle Rutledge, captioned *Sapphire Center for Rehabilitation & Nursing of Central Queens v. Rutledge*, CV-009929-23/QU ("the 2023 Collection Lawsuit"). **Exhibit K** (2023 Summons and Complaint).

73.     Like the 2021 Collection Lawsuit, the Summons and Complaint were both signed by Defendant Andrea M. Trochez. *Id.*

74.     Further, just like the 2021 Collection Lawsuit, Trochez also signed an Attorney's Affirmation (*Id.,* p. 8), stating in pertinent part that she had read the complaint, knew the contents thereof, and "To the best of my knowledge, the contents of the complaint are true except those matters alleged on information and belief, as to those matters I believe them to be true."

75.     Again, just like the 2021 Collection Lawsuit, she also stated that she reviewed "documents and records in possession of plaintiff" and had "conversations and communications with employees, agents and servants of plaintiff." *Id.*

76.     Attorney Defendants thus represented to the court and to Danielle Rutledge that they had performed a meaningful attorney review prior to filing the 2023 Collection Lawsuit.

77.     Because the 2023 Collection Lawsuit was basically identical to the 2021 Collection Lawsuit (*compare* **Exhibit K** to **Exhibit H**), it seems dubious that any such meaningful attorney review was performed, since any attorney doing such a review would at minimum take the time to determine whether the amount of the debt had changed between the filing of the 2021 Collection Lawsuit and the refiling of the same claims in the 2023 Collection Lawsuit and whether the debts were now time-barred due to the passage of nearly 2 years.

78.     The debt Defendants' sought to collect in the 2023 Collection Lawsuit (and in the 2021

Collection Lawsuit) was subject to the three year statute of limitations for medical debts under C.P.L.R. § 213-d.

79.     Any meaningful review would show, per the invoice attached to the Collection Lawsuit, that the oldest debt sought arose from treatment on May 6, 2018 and the most recent on October 6, 2019.

80.     Applying 228 days of COVID-19 tolling and the 3 year statute of limitations under CPLR § 213-d, claims for these debts had to be filed, at the oldest, before December 20, 2021, and at the most recent, before May 21, 2023.

81.     Since the 2023 Collection Lawsuit was filed on June 15, 2023, the entire debt sought was time-barred.

82.     Further, the January Resident Funds Ledger (**Exhibit I**), showing that there was a credit for the services for Edna Rutledge rather than a debt, at minimum raises a strong inference that the amount of the debt had decreased between the filing of the 2021 and 2023 Collection Lawsuits.

83.     Representation of meaningful review was either false, or Attorney Defendants reviewed the Complaint, saw the action was time-barred and for the wrong amount, and proceed to file the action anyways.

84.     Lastly, Defendant Andrea Trochez, having voluntarily discontinued the 2021 Collection Lawsuit, knew or should have known that the statute of limitations for Defendants' claims against Danielle Rutledge were no tolled under C.P.L.R. § 205 (listing as one of the exceptions to tolling "a voluntary discontinuance").

85.     Even if Attorney Defendants were not familiar with C.P.L.R. § 205, which would be odd given the volume of New York cases they litigate, the rule should be intuitive to any attorney – if one could toll the statute of limitations for a claim just by voluntarily discontinuing the case

13

without prejudice, one could create a theoretically infinitely long time to bring a claim by filing a lawsuit, voluntarily discontinuing, and then refiling again within 30 days to comply with C.P.L.R. § 205.

86.     Like the 2021 Collection Lawsuit, the 2023 Collection Lawsuit sought $24,632 with interest from November 30, 2019 and costs. *Id.*

### *Defendants Continue to Litigate the 2023 Collection Lawsuit After Being Put on Notice Repeatedly that It Should Be Dismissed*

87.     Defendants claimed to have served the 2023 Summons and Complaint upon a "John Doe" son of Danielle at her apartment on July 6, 2023. Regardless of whether this service was actually affected, Danielle received the 2023 Summons and Complaint herself in the mail.

88.     Confusingly, Sapphire sent Danielle another Resident Funds Ledger on or around October 19, 2023. **Exhibit L** (October Resident Funds Ledger).

89.     Like the prior Ledger, this one also showed a credit, this time increased to $4,861.37. *Id.*

90.     On December 29, 2023, Danielle filed a *pro se* Answer. **Exhibit M** (*Pro Se* Answer).

91.     Danielle provided notice to Defendants of the aforementioned impropriety of the 2023 Collection Lawsuit in her Answer, namely (1) that the statute of limitations had passed and the suit was time-barred, and (2) that the amount of the debt was incorrect, among other defenses.

92.     Having received this Answer asserting these defenses, Attorney Defendants should have determined, at minimum, whether the 2023 Collection Lawsuit was time-barred and whether the amount was correct. And once they determined that it was time-barred, a simple arithmetic calculation, the 2023 Collection Lawsuit should have been discontinued.

93.     Instead, on or around March 28, 2024, the Attorney Defendants, on behalf of the Nursing Home, propounded discovery requests to Danielle. **Exhibit N** (Discovery Requests).

94.     The Discovery Requests were signed by Defendant Andrea Trochez.

Last saved: 6/12/2024 1:30 PM

95.     The Discovery Requests consisted of 15 requests for production of documents and an astonishing 36 interrogatories. *Id.* Ironically, the discovery demands sought the basis of Ms. Rutledge's affirmative defense of statute of limitations.

96.     Most of these Discovery Requests sought information that was already in the possession, custody, or control of Defendants. *Id.*

97.     Notably, certain documents and information were *only* in the possession of the Defendants – for example, Interrogatory No. 2 asks to "Itemize all payments made by Resident to Plaintiff." Because the Nursing Home had, for years at this point, been receiving Edna Rutledge's Social Security checks directly, only they had direct knowledge of what payments had been made. *Id.,* p. 7.

98.     Accordingly it appears that either Attorney Defendants performed no meaningful attorney review and simply issued a standard set of discovery requests for contested nursing home collection lawsuits, or that Attorney Defendants hoped to wear down a *pro se* consumer with voluminous and at least partially frivolous discovery requests. If the pro se consumer did not timely or fully answer the discovery demands, the Attorney Defendants could then move to strike the answer and obtain a default judgment.

99.     Attorney Defendants knew or should have known that these Discovery Requests were immaterial as the entire debt they were seeking was time-barred.

100.    Upon information and belief, Attorney Defendants continued to litigate the 2023 Collection Lawsuit, knowing it was time-barred, in the hopes of pressuring Danielle into entering into a settlement or to move to strike her answer to the complaint if they believed the answers were not complete and timely.

101.    Scared and confused, Danielle Rutledge sought help from The Legal Aid Society.

102.    While The Legal Aid Society could not represent her in the 2023 Collection Lawsuit, it did provide her with *pro se* assistance in drafting discovery responses, which were mailed by Danielle to Attorney Defendants on May 13, 2024. **Exhibit O** (Discovery Responses).

103.    The Discovery Responses restated the facial discrepancies in the amount sought, providing the January and October Resident Funds Ledgers showing credits rather than debts (p. 29). **Exhibit O**.

104.    Further, on May 21, 2024, Danielle emailed Defendant Andre Trochez and requested a copy of the "billing statements from October and November 2019." **Exhibit P** (Email to Trochez).

105.    It is unclear if it was sent in response to this email or anything else, but on or around May 31, 2024, the Nursing Home mailed Danielle Rutledge another Invoice. **Exhibit Q** (2024 Invoice).

106.    Shockingly, despite the credits listed on the January and October Resident Funds Ledgers just a few months before, the 2024 Invoice claimed that Danielle owed $14,384.60 to the Nursing Home. *Id.*

107.    It is unclear if this amount is in addition to the 2023 Collection Lawsuit, the actual debt owed after applying the credits shown in the Resident Funds Ledgers, or some other amount entirely.

108.    But notably, like the January Resident Funds Ledger, the 2024 Invoice has on its face dubious accounting.

109.    The 2024 Invoice shows "PAYMENT[s]" dated January 31, 2024, February 29, 2024, March 29, 2024, May 14, 2024, and May 29, 2024. Each of these payments has a corresponding 4 digit number: #2717, #2750, #2773, #2816, and #2826.

110.    Based on almost all of the payments being the same amount as the corresponding NAMI charges for each month, it appears these payments are in fact the Social Security checks of Edna

Rutledge.

111.    But oddly, the payments dated January 31, 2024 and February 29, 2024 are applied to dates "04/2019," "05/2019," "01/2021," and "02/2021" in varying amounts: $315.00, $321.40, $119.70, and $516.70.

112.    When the amounts are added up, it becomes clear that the checks were for $2,975. However, the NAMI charges are instead the reduced amount after applying seemingly arbitrary numbers to past dates - $2,338.60.

113.    Rather than clarifying anything, the 2024 Invoice creates another layer of confusion, as well as raising suspicion that the monthly NAMI is not being properly deducted from Edna Rutledge's Social Security checks.

***Retaining Private Counsel to Appear and Demand to Discontinuance***

114.    On June 3, 2024, Danielle Rutledge retained private counsel to defend her in the collection lawsuit and became contractually liable for attorney's fees and costs for defending the collection lawsuit.

115.    Also on June 3, 2024, Danielle Rutledge through her attorneys sent a Demand Letter to Discontinue to Defendants via Defendant Andrea Trochez by fax and email. **Exhibit R** (Demand Letter to Discontinue).

116.    The Demand Letter noted that the 2023 Collection Lawsuit was time-barred, that the Admission Agreement violated the Nursing Home Reform Act, and that the alleged debt being $24,632 did not appear to be accurate. *Id.*

117.    The Demand Letter attached a Stipulation of Discontinuance (*Id.,* p. 4), and demanded that it be executed and returned by 5 PM EST on June 6, 2024.

118.    No executed Stipulation was received by that time, or as of the filing of this complaint.  By

failing to discontinue the action after being put on clear notice the Collection Lawsuit was time-barred, Defendants have ratified their prior misconduct. As of this filing, the 2023 Collection Lawsuit is still pending.

119.    Private counsel has noticed an appearance in the Collection Lawsuit.

**Attorney Defendants routinely file time-barred lawsuits to collect nursing home debts**

120.    Upon a review of publicly available filings on the New York State Electronic Court Filing system, Plaintiff's counsel has identified at least 18 collection lawsuits[2] seeking a nursing home debt where most or all of the debt is time-barred on their face.

121.    These 18 time-barred lawsuits represent just a small sample – most lawsuits filed in New York's civil courts, where Attorney Defendants file most of their collection lawsuits, are not available electronically to review. The search by Plaintiff's counsel was further limited to cases filed on or after January 1, 2022.

122.    17 of the 18 time-barred lawsuits were filed by Defendant Andrea Trochez.

123.    11 of the 18 time-barred lawsuits sought debts that were entirely time-barred.

124.    While the majority of these time-barred lawsuits could be a reckless or willful application of the six year statute of limitations for breach of a contract generally rather than the 3 year statute

---

2 Plaintiff incorporates by reference the publicly available documents of the following lawsuits identified by caption: *Mountainside Residential Care Center v. Berg,* Index No. EF2022-458; *Mountainside Residential Care Center v. Estate of Arthur C. Lyman, Jr.,* Index No. EF2022-27; *Sunharbor Manor v. Cooper,* Index No.152121/2023; *Cold Spring Hills Center for Nursing and Rehabilitation v. Burnett,* Index No. 721698/2022; *The New Jewish Home v. Benton,* Index No. 158952/2022; *Cold Spring Hills Center for Nursing & Rehabilitation v. Roberts,* Index No. 617759/2022; *Chautauqua Nursing and Rehabilitation Center v. Buck,* Index No. EK12023001241; *Affinity Skilled Living & Rehabilitation Center v. Fernandez,* Index No. 611834/2022; *Luxor Nursing and Rehabilitation at Sayville v. Rooney,* Index No. 203673/2022; *Elderwood at Cheektowaga v. Wyzykowski,* Index No. 810758/2022; *Comprehensive at Williamsville LLC v. Belter,* Index No. 805765/2022; *Absolut at Aurora Park v. Amodia,* Index No. 809409/2022; *Our Lady of Consolation Nursing & Rehabilitative Care Center v. Estate of Lucy Agnello,* Index No. 601352/2023; *Momentum at South Bay for Rehabilitation and Nursing v. Catalano,* Index No. 205222/2022; *Schaffer Extended Care Center v. Nair,* Index No. 64396/2022; *Jewish Home Lifecare, Manhattan v. Bush,* 158346/2022; *Affinity Skilled Living & Rehabilitation Center v. Luongo,* Index No. 604102/2023; *Suffolk Center for Rehabilitation and Nursing v. Douglas,* Index No. 614394/2022.

of limitations for medical debt under CPLR § 213-d, the collection lawsuit against Rosetta Bush and Elender Foxe suggests a broader disregard for applying any statute of limitations before filing.

**Exhibit S** (*Bush* Complaint)

125.     The debt in *Bush* arises from care dating as far back as "April 2015" and as recently as "April 2017." *Id.,* ¶ 7.

126.     Since the lawsuit was filed on September 29, 2022, Attorney Defendants would have or should have seen that even with the application of a 6 year statute of limitations *and* 228 days of COVID-19 tolling, a significant amount of the debt would be time-barred.

127.     Disturbingly, Attorney Defendants moved for a default judgment in this clearly time-barred action, though as of this filing it has not yet been granted.

## Defendants inflicted significant damages on Ms. Rutledge by filing and litigating a frivolous, time barred collection lawsuit.

128.     While this lawsuit does not seek damages for any misconduct towards Edna Rutledge, the nursing home resident, the unlawful Collection Lawsuit happened in the context of her daughter Danielle Rutledge having to frequently butt heads with the Nursing Home over basic issues of care regarding her mother.

129.     The Nursing Home facilitated two non-emergency surgeries on Edna Rutledge without notifying Danielle beforehand. The staff at the Nursing Home have frequently and inappropriately told Danielle that she should be having her mother put on a "Do Not Resuscitate" Order. The Nursing Home cut her mother's hair without permission, and when Danielle complained, they promised to not do it again, only to cut her hair again later.

130.     The frivolous Collection Lawsuit was even more frustrating given the context of seeking to collect a debt resulting from a questionable level of care.

131.     Ms. Rutledge did not understand why the Nursing Home had not sent her bills earlier if

they had believed she owed this debt.

132.     When she did not hear anything else about the 2021 Collection Lawsuit, she assumed it must have been on hold due to the Attorney General's investigation.

133.     She was confused when she received the Discontinuance for the 2021 Collection Lawsuit in the mail, and frustrated when she was informed that "without prejudice" meant that they might try to bring the lawsuit against her again.

134.     When she got the 2023 Collection Lawsuit in the mail, she was very annoyed.

135.     She would get so frustrated with the Collection Lawsuit that she would cry. She would try not to cry because it would just make her spiral, becoming more irritated and upset. She has cried regularly from the date of the 2023 Collection Lawsuit to now.

136.     She felt overwhelmed, sad, and disgusted by the 2023 Collection Lawsuit.

137.     She wishes she had siblings to help take on some of this stress, just so she could be free from it for a couple of days.

138.     She does not sleep well, usually having to get at up at 5:30 AM for work, but being unable to fall asleep until 1 or 2 AM, because of the stress of the 2023 Collection Lawsuit. This has been going on since the collection lawsuit, and still happens.

139.     To try to make herself sleep, she will watch TV, read books, take a bath, and burn candles.

140.     She spends a lot of time trying to think of more ways to make money, just in the hopes that she could make enough to pay them off and have one less stressful thing to deal with.

141.     Just the principal amount of the debt for which Defendants are seeking judgement in the 2023 Collection Lawsuit, $24,632, is more than half of what Ms. Rutledge earns in an entire year. The 2023 Collection Lawsuit also represents to Ms. Rutledge that the judgment would also contain some five years of interest (since November 30, 2019), plus attorney's fees and costs.

142.    Ms. Rutledge is afraid the Attorney Defendants will get a judgment against her and will use that judgment to garnish her wages and levy her bank account.

143.    She is worried she might wind up homeless, and she is well aware of how that happens because she works for a nonprofit providing services to the homeless.

144.    Danielle lives with her adult sons Elijah and Malcolm, who have witnessed her distress despite her attempts to hide it from them since she does not want to burden them.

145.    When the stress becomes too overwhelming, she will seclude herself from everyone.

146.    Because of the stress and fear of the 2023 Collection Lawsuit, Ms. Rutledge cries three to four times a week from the beginning of the lawsuit through now.

147.    Danielle was particularly upset when attorneys at court accused her of having all the money sought by the Nursing Home and just hiding it away somewhere.

148.    In court, she would be so nervous and anxious that she would sweat. She was embarrassed for other people to be hearing about this Lawsuit against her.

149.    In addition to her emotional distress, Danielle also had to take time off of work to go to court using a sick day, and incurred costs in defending the lawsuit including postage for her *pro se* Answer, her answers to the Defendants' discovery requests, bus fare, and being contractually liable for attorney's fees and costs to defend her in the 2023 Collection Lawsuit.

150.    Given the pendency of the 2023 Collection Lawsuit, both emotional distress and monetary damages are ongoing at the time of this filing.

### D.    COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (AS TO ATTORNEY DEFENDANTS)

151.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

152.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt

Last saved: 6/12/2024 1:30 PM

collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

153.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

154.    The obligation allege to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative nursing home debt was incurred primarily for family, personal or household purposes.

155.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

156.    Defendants are "debt collector[s]" as defined in 15 U.S.C. § 1692a(6) because they regularly attempt to collect debts, directly or indirectly.

157.    Defendants collect putative debts by filing hundreds of collection lawsuits seeking to collect putative nursing home debts.

158.     On information and belief, Defendant also sends out hundreds of collection letters seeking to collect putative nursing home debts.

159.     The actions of Defendant enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

160.     Defendant materially violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation Defendant materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

161.     The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

162.     Danielle Rutledge suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for postage, and for hiring counsel to represent her in the collection lawsuit, becoming contractually liable to pay attorneys' fees and costs.

163.     Danielle Rutledge's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

164.     Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### E.     COUNT #2: NY JUDICIARY LAW § 487 (AS TO ATTORNEY DEFENDANTS)

165.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

166.     New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

167.     As enumerated in the Statement of Facts, Attorney Defendants violated Judiciary Law § 487, and these violations were part of a larger fraudulent scheme greater in scope than the issues determined in the collection lawsuit against Danielle Rutledge.

168.     Judiciary Law § 487 is a traditional cause of action in American courts - N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg,* 12 N.Y.3d 8, 14 (2009).

169.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

**F.    COUNT #3: NEW YORK GENERAL BUSINESS LAW § 349 (AS TO ALL DEFENDANTS)**

170.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

171.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

172.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both." N.Y. Gen. Bus. Law § 349(h).

173.    Defendants' actions were consumer oriented.  Conduct does not require a repetition or pattern of deception in order to be consumer oriented.

174.    Defendants committed the above described acts willfully and/or knowingly.

175.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

176.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 et seq, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, as to recover actual and punitive damages, costs and attorney's fees.

177.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

178.    Danielle Rutledge suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for postage, and for hiring counsel to represent her in the collection lawsuit, becoming contractually liable to pay

attorneys' fees and costs.

179.    Danielle Rutledge's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, wrongful litigation, and abuse of process.

180.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## G.    COUNT #4: GROSS NEGLIGENCE (AS TO ALL DEFENDANTS)

181.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

182.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

183.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

184.    Defendants' actions evince a reckless disregard for the rights of Danielle Rutledge and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

185.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Danielle Rutledge is entitled to a punitive damage award.

## H.    JURY DEMAND.

186.    Plaintiff demands a trial by jury.

## I.    PRAYER

187.    WHEREFORE, Plaintiff requests the following relief:

Last saved: 6/12/2024 1:30 PM

a.    A declaration Defendant has committed the violations of law alleged in this action;

b.    An order enjoining and directing Defendant to cease violating G.B.L. § 349 *et seq.*;

c.    Statutory damages under 15 U.S.C. § 1692k;

d.    An order awarding disbursements, costs, and attorneys' fees;

e.    A judgment for actual, punitive, statutory, and treble damages;

f.    Prejudgment and post judgment interest as allowed by law;

g.    All other relief, in law and in equity, both special and general, to which Plaintiff may be

justly entitled.

Dated:  Brooklyn, New York
           June 12, 2024

                              Respectfully submitted,
                              /s/
                              Ahmad Keshavarz
                              The Law Office of Ahmad Keshavarz
                              16 Court St., Ste. 2600
                              Brooklyn, NY 11241
                              Phone: (718) 522-7900
                              Fax:    (877) 496-7809
                              Email: ahmad@NewYorkConsumerAttorney.com